UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
GAINESVILLE DIVISION

ANTHONY WAYNE HARDIGREE,

    Plaintiff,

    v.

MARC LOFTON, CITY OF
STATHAM, GARRETT SMITH, and
CHAD NORRIS,

    Defendants.

CIVIL ACTION NO.

2:17-CV-236-RWS

## <u>O R D E R</u>

This case is before the Court on Defendants' Motions for Summary Judgment [Doc. Nos. 55, 57, 59, and 60] and Plaintiff's Motion for Partial Summary Judgment [Doc. No. 63].

## I.    Factual Background

This is a civil action related to the allegedly unlawful arrest of Plaintiff Anthony Wayne Hardigree on August 4, 2016, at a mobile home in Statham, Georgia.

### A.    Drug Investigation of Anthony Rodgers

Anthony Rodgers, known in the Statham community as "Antman" and/or "Ant," was the subject of a criminal drug investigation [Doc. No. 60-2, ¶ 1,

admitted]. Based upon information from a confidential informant, law enforcement officers were conducting surveillance of a known drug house on Wall Road in Statham, Georgia, on August 4, 2016 [Doc. No. 57-2, ¶ 1, admitted]. Defendant Chad Norris, a Barrow County Sheriff's Deputy, and Defendant Marc Lofton, a City of Statham police officer, were involved in the surveillance operation [Doc. No. 60-2, ¶ 1, admitted]. Law enforcement observed Antman leaving the Wall Road residence in a red Ford Explorer [Doc. No. 57-2, ¶ 2, admitted]. After losing Antman, Defendant Norris made a call out on the radio to stop the Explorer [Id., ¶ 3, admitted; Doc. No. 60-2, ¶ 2, admitted].

Nicole Geiman, another Barrow County Sheriff's Deputy, followed up on the radio traffic connected to Antman and joined the search for his Explorer [Doc. No. 60-2, ¶ 3, admitted]. After a few minutes, Deputy Geiman spotted the Explorer near a mobile home located on McCarty Road in a mobile home park [Doc. No. 57-2, ¶¶ 5-6, admitted]. This mobile home was Plaintiff's residence [Id., ¶ 5, admitted]. As she pulled up, Deputy Geiman observed Antman leaving Plaintiff's residence carrying a bag or backpack over his shoulder and getting back into his Explorer [Doc. No. 60-2, ¶ 5, admitted]. Deputy Geiman approached the vehicle, and Defendant Lofton arrived shortly thereafter [Doc. No. 63-2, ¶¶ 13-14, admitted]. Defendant

Smith, a Georgia State Patrol Trooper, was also asked to assist with the traffic stop [Doc. No. 55-1, ¶ 1, admitted].

Trooper Smith saw Deputy Geiman speaking with Antman through the driver's side door of the Ford Explorer [Id., ¶ 7, admitted]. Trooper Smith asked Antman for his driver's license and immediately noticed an odor of marijuana [Id., ¶ 8, admitted]. Deputy Geiman and Officer Lofton then arrested Antman and a female occupant of the Explorer [Doc. No. 63-2, ¶ 15, admitted]. Deputy Geiman, Trooper Smith, and Officer Lofton then searched the Explorer [Id., ¶ 16, admitted]. Inside the vehicle, they found approximately 29 grams of methamphetamine, some marijuana, and other drug paraphernalia [Doc. No. 55-1, ¶ 13, admitted]; Doc. No. 57-2, ¶ 12, admitted]. During the search and while waiting for Deputy Norris to arrive at the scene, Deputy Geiman informed Officer Lofton and Trooper Smith that she had seen Antman walking from Plaintiff's residence [Doc. No. 57-2, ¶ 13, admitted]. Deputy Norris arrived about twenty-five minutes after Deputy Geiman initiated the stop of the Explorer [Id., ¶ 15, admitted].

### B. Interaction with Plaintiff

Trooper Smith then approached the mobile home to conduct a knock-and-talk with the residents [Doc. No. 55-1, ¶ 15, admitted]. One of the female residents, Torry Craig, answered the door [Id., ¶ 16, admitted]. Ms. Craig told Trooper Smith

that she did not know Antman but that her husband, Plaintiff Hardigree, had spoken with him [Id., ¶ 17, admitted].  Ms. Craig then left the doorway of the mobile home to get Plaintiff Hardigree [Id., ¶ 18, admitted].  Officer Lofton also approached the door to speak with Plaintiff [Doc. No. 57-2, ¶ 21, admitted].  Plaintiff stated that he did not know Antman well and that he was at the house to ask about a job at Plaintiff's brother's welding shop [Id., ¶ 19, admitted; Doc. No. 63-2, ¶ 25, admitted].  Officer Lofton interjected that Plaintiff was "in the game, too" [Doc. No. 57-2, ¶ 23, admitted].  Deputy Norris then approached the mobile home [Id., ¶ 25, admitted].  Trooper Smith then stepped away, returning to his patrol car for a short period of time and then standing near the door of the mobile home [Id.].

Deputy Norris asked for permission to come inside the residence to search it, but Plaintiff refused to give his consent [Id., ¶ 26, admitted].  He stated that the residence belonged to his sister [Id., ¶ 27, admitted].  Plaintiff argued with Officer Lofton and Deputy Norris about closing his door and terminating the police encounter; they told Plaintiff that he needed to exit the residence [Id., ¶ 29, admitted].  Instead, Plaintiff turned around to go farther inside the residence; he states that he did so to call his sister [Doc. No. 60-2, ¶¶ 19-20, admitted].  Deputy Norris then shouted "10-10," the code for a fight in progress. [Doc. No. 55-1, ¶ 26, admitted].

Officer Lofton entered the residence, followed by Deputy Norris, and tried to stop Plaintiff from continuing farther into the residence [Doc. No. 57-2, ¶ 38, admitted]. Officer Lofton then unholstered his taser and deployed it while Plaintiff was standing up and facing him [Id., ¶ 40, admitted]. Trooper Smith and Deputy Geiman rushed into the mobile home to assist [Id., ¶ 42, admitted]. Plaintiff was on the ground, and Officer Lofton ordered him to show his hands [Id., ¶ 43, admitted]. Plaintiff did not do so, and Officer Lofton used his taser in a "drive stun" [Id., ¶ 47, admitted]. Upon entering, Trooper Smith saw Plaintiff face-down on the ground while Officer Lofton deployed the taser prongs and Deputy Geiman attempted to place handcuffs on Plaintiff [Doc. No. 55-1, ¶ 28, admitted]. Plaintiff was then placed under arrest and charged with simple assault and battery (under O.C.G.A. § 16-5-23), disorderly conduct (under O.C.G.A. § 16-11-39), and obstructing law enforcement officers (under O.C.G.A. § 16-10-24) [Doc. No. 55-1, ¶ 36, admitted].

Trooper Smith then conducted a protective sweep of the mobile home [Doc. No. 55-1, ¶ 32, admitted]. Trooper Smith's only interaction with Plaintiff during or after the use of force was after he had been placed under arrest and taken outside of the mobile home [Id., ¶ 37, admitted]. Trooper Smith did not use any hands-on force against Plaintiff [Id., ¶ 39, admitted].

## C.     Procedural History

This case was filed on November 13, 2017 [Doc. No. 1]. Plaintiff filed a Second Amended Complaint on March 16, 2018 [Doc. No. 27]. In Counts One, Two, and Four, Plaintiff asserts claims under 42 U.S.C. § 1983 against the individual Defendants for unlawful entry, false arrest, and excessive force [Id.]. In Count Three, Plaintiff asserts a § 1983 claim against Defendant Lofton for malicious prosecution [Id.]. In Count Five, Plaintiff asserts state law claims against Defendants Lofton and City of Statham for false imprisonment, assault, battery, and malicious prosecution [Id.]. All parties have now moved for summary judgment [Doc. Nos. 55, 57, 59, 60 and 63].

## II.     Legal Standard

Federal Rule of Civil Procedure 56 requires that summary judgment be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). "The moving party bears 'the initial responsibility of informing the . . . court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact.'" Hickson Corp. v. N. Crossarm Co., 357 F.3d 1256, 1259 (11th Cir. 2004) (quoting

Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986) (internal quotations omitted)). Where the moving party makes such a showing, the burden shifts to the non-movant, who must go beyond the pleadings and present affirmative evidence to show that a genuine issue of material fact does exist. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 257 (1986). The applicable substantive law identifies which facts are material. Id. at 248. A fact is not material if a dispute over that fact will not affect the outcome of the suit under the governing law. Id. An issue is genuine when the evidence is such that a reasonable jury could return a verdict for the non-moving party. Id. at 249-50.

In resolving a motion for summary judgment, the court must view all evidence and draw all reasonable inferences in the light most favorable to the non-moving party. Patton v. Triad Guar. Ins. Corp., 277 F.3d 1294, 1296 (11th Cir. 2002). But, the court is bound only to draw those inferences that are reasonable. "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." Allen v. Tyson Foods, Inc., 121 F.3d 642, 646 (11th Cir. 1997) (quoting Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986)). "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." Anderson, 477 U.S. at 249-50 (internal citations omitted); see also Matsushita, 475 U.S. at 586 (once the

moving party has met its burden under Rule 56(a), the nonmoving party "must do more than simply show there is some metaphysical doubt as to the material facts").

## III.    Analysis

The Court will discuss the qualified immunity doctrine generally and then address each party's arguments in turn.

### A.    Qualified Immunity Doctrine

The doctrine of qualified immunity protects governmental officials who are sued under 42 U.S.C. § 1983 for money damages in their personal, or individual capacities, but only so long as "their conduct violates no clearly established statutory or constitutional rights of which a reasonable person would have known."  Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982).  The doctrine requires that a defendant claiming immunity must initially "prove that 'he was acting within the scope of his discretionary authority when the allegedly wrongful acts occurred.'"  Lee v. Ferraro, 284 F.3d 1188, 1194 (11th Cir. 2002) (quoting Courson v. McMillian, 939 F.2d 1479, 1487 (11th Cir. 1991)).  If that threshold prerequisite is satisfied, courts generally apply a two-part test.  The initial inquiry requires the court to determine whether the facts, viewed "in the light most favorable to the party asserting the injury," show that "the officer's conduct violated a constitutional right."  Saucier v. Katz, 533 U.S. 194, 201 (2001). If that initial inquiry is answered affirmatively, then

the court will proceed to analyze the second aspect of the two-part test: *i.e.*, "whether the right was clearly established." Id. Strict adherence to the order of those two inquiries is not required, however. See Pearson v. Callahan, 555 U.S. 223, 236 (2009) ("On reconsidering the procedure required in Saucier, we conclude that, while the sequence set forth there is often appropriate, it should not longer be regarded as mandatory.") Instead, in appropriate cases, it is within a district court's discretion to assume that a constitutional violation occurred in order to address, in the first instance, the question of whether such a presumed violation was "clearly established" on the date of the incident leading to suit. Id.

When determining whether the unlawfulness of an official's actions was "clearly established," the pertinent question is whether the state of the law on the date of the defendant's alleged misconduct placed defendants on "fair warning that their alleged treatment of [the plaintiff] was unconstitutional." Hope v. Pelzer, 536 U.S. 730, 741 (2002); Williams v. Consolidated City of Jacksonville, 341 F.3d 1261, 1270 (11th Cir. 2003). The Supreme Court has rejected the requirement that the facts of previous cases must always be "materially similar" to those facing the plaintiff. Hope, 536 U.S. at 739. Instead, for a constitutional right to be deemed "clearly established,"

> its contours "must be sufficiently clear that a reasonable official would understand that what he is doing violates that right. This is not to say

that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful; but it is to say that in the light of pre-existing law the unlawfulness must be apparent.

Hope, 536 U.S. at 741 (citations omitted).  An officer can receive "fair notice" of his or her unlawful conduct in various ways.

First, the words of the pertinent federal statute or federal constitutional provision in some cases will be specific enough to establish clearly the law applicable to particular conduct and circumstances and to overcome qualified immunity, even in the *total absence of case law*.  This kind of case is one kind of "obvious clarity" case.  For example, the words of a federal statute or federal constitutional provision may be so clear and the conduct so bad that case law is not needed to establish that the conduct cannot be lawful.

Second, if the conduct is not so egregious as to violate, for example, the Fourth Amendment on its face, we then *turn to case law*.  When looking at case law, some broad statements of principle in case law are not tied to particularized facts and can clearly establish law applicable in the future to different sets of detailed facts.  For example, if some authoritative judicial decision decides a case by determining that "X Conduct" is unconstitutional *without tying* that determination to a particularized set of facts, the decision on "X Conduct" can be read as having clearly established a constitutional principle: put differently, the precise facts surrounding "X Conduct" are immaterial to the violation.  These judicial decisions can control "with obvious clarity" a wide variety of later factual circumstances.  These precedents are hard to distinguish from later cases because so few facts are material to the broad legal principle established in these precedents; thus, this is why factual differences are often immaterial to the later decisions.  But for judge-made law, there is a presumption against wide principles of law.  And if a broad principle in case law is to establish clearly the law applicable to a specific set of facts facing a governmental official, it must do so "with obvious clarity" to the point that every objectively reasonable government official facing the circumstances would know

that the official's conduct did violate federal law when the official acted.

Third, if we have no case law with a broad holding of "X" that is not tied to particularized facts, we then look at precedent *that is tied to the facts*. That is, we look for cases in which the Supreme Court or we, or the pertinent state supreme court has said that "Y Conduct" is unconstitutional in "Z Circumstances." We believe that most judicial precedents are tied to particularized facts and fall in this category. . . . When fact-specific precedents are said to have established the law, a case that is fairly distinguishable from the circumstances facing a government official cannot clearly establish the law for the circumstances facing that government official; so, qualified immunity applies. On the other hand, if the circumstances facing a government official are not fairly distinguishable, that is, are materially similar, the precedent can clearly establish the applicable law.

Vinyard v. Wilson, 311 F.3d 1340, 1350-52 (11th Cir. 2002) (citations omitted, emphasis in original). See also Ashcroft v. al-Kidd, 563 U.S. 731, 741 (2011) ("We do not require a case directly on point, but existing precedent must have placed the statutory or constitutional question beyond debate.").

## B.    Defendant Statham Police Officer Marc Lofton

Plaintiff asserts federal claims against Defendant Statham Police Officer Marc Lofton for illegal entry (Count One), false arrest (Count Two), malicious prosecution (Count Three), and excessive force (Count Four), and state law claims for false imprisonment, assault and battery, and malicious prosecution (Count Five). Officer Lofton asserts that he is entitled to summary judgment for four reasons: (1) Plaintiff cannot establish a malicious prosecution claim; (2) he did not violate Plaintiff's

constitutional rights; (3) assuming he violated Plaintiff's constitutional rights, he is entitled to qualified immunity; (4) Plaintiff's state law claims fail because there was probable cause; and (5) he is entitled to official immunity for claims based on state law. Plaintiff argues that he is entitled to summary judgment on Count One because Officer Lofton violated his clearly established Fourth Amendment rights by illegally entering his home. The Court will address the series of events that took place during the encounter between Plaintiff and law enforcement and address qualified immunity in turn.

### 1.    Knock and Talk to <u>Terry</u> Stop

Plaintiff's encounter with law enforcement began with what appears to be a run-of-the-mill "knock and talk" when Trooper Smith knocked on Plaintiff's door. Law enforcement "[o]fficers are allowed to knock on a residence's door or otherwise approach the residence seeking to speak to the inhabitants just as any private citizen may." <u>United States v. Taylor</u>, 458 F.3d 1201, 1204 (11th Cir. 2006).

> [W]hen a citizen is not detained by a <u>Terry</u> stop or otherwise lawfully detained and chooses to speak with an officer, that citizen has the right to cease answering questions and walk away from the officer; this encounter is entirely voluntary. When this type of interaction occurs as the result of a citizen's decision to speak with officers after they knock on the door of his home, provided that no warrant or probable cause and exigent circumstances exist, the citizen has the right to terminate his voluntary participation in the conversation by retiring into his home and closing the door.

<u>Moore</u>, 806 F.3d at 1044, n.11.

At some point in time, Officer Lofton and Deputy Norris approached the porch, and Trooper Smith moved away towards his patrol car. The audio recording of the encounter[1] from Officer Lofton's dash camera captured the following dialogue:

LOFTON:        How do you know this guy [Antman]?

PLAINTIFF:    I don't really know him.

LOFTON:        He didn't bring you anything?

PLAINTIFF:    Just now?

LOFTON:        Yes, just now.

PLAINTIFF:    No, sir.

LOFTON:        He came inside?

PLAINTIFF:    Yes, I gave him a water and sent him on his way.

LOFTON:        So, he didn't bring you anything?

PLAINTIFF:    No, sir.

LOFTON:        What'd he do? What do you think he did?

---

[1] The Court has transcribed the encounter as accurately as possible. At some points during the audio recording, it is unclear whether Deputy Norris or Officer Lofton is speaking. At such times, the Court will refer to the speaker as "Officer." The parties have addressed many of the statements in their Statements of Material Facts.

| | |
|---|---|
| PLAINTIFF: | I don't know. |
| LOFTON: | So you don't know what he was doing? |
| PLAINTIFF: | No, I don't know what he was doing. |
| LOFTON: | You do, too. You're in the game, too, man. I've arrested you. I've locked you up before. [referencing Plaintiff's previous DUI (less safe) arrest] |
| PLAINTIFF: | I was taking medication because I was sick. |
| LOFTON: | You were not sick. |
| PLAINTIFF: | I was too sick. I got the paperwork that shows I was sick. I nearly died. I would've died if I would've stayed at that jail over there. You can believe that or not . . . [unintelligible]. Y'all do what y'all gotta do. |
| NORRIS: | Hey, buddy. What's your name? |
| PLAINTIFF: | Anthony. |
| NORRIS: | Anthony who? |
| PLAINTIFF: | Hardigree. |
| NORRIS: | Can we come inside? |
| PLAINTIFF: | No, sir. |
| NORRIS: | No? |
| PLAINTIFF: | It's not my house. |
| NORRIS: | It's not your house? |
| PLAINTIFF: | No. |

NORRIS:        Okay.  Where do you live?

PLAINTIFF:     I live here.  I stay here.  But it's not my house.

NORRIS:        Whose house is it then?

PLAINTIFF:     My sister's.

NORRIS:        Can you call her then?

PLAINTIFF:     Uh, yeah, I'll call her.

NORRIS:        Whoa, stay right there.

PLAINTIFF:     It's my door.  I can't close my door?  You can't keep me from shutting my door.

NORRIS:        Whoa, stay right there.

PLAINTIFF:     It's my door.  I can't close my door?  You can't keep me from shutting my door.

OFFICER:       Uh, yeah, we can.

PLAINTIFF:     What have I done?

NORRIS:        Let me explain it to you.  . . .  Calm down.  The thing is, we've got a known drug dealer coming to your house, coming in with a backpack.  Coming out with a backpack. He got drugs all over him.  See, you're talking too fucking much.

PLAINTIFF:     No, I'm not.

NORRIS:        Give me a second.  Let me explain to you everything we got right now so you can make an educated decision.  The more you talk, the worse it's going to be.  So just give me a second.  So, we got a drug dealer, coming in your house

and coming out, and he's got a whole lot of drugs all over him. That leads us to believe – would leave anybody to believe – he picked em up or dropped em off here. Now, listen, the whole way you're acting leads us to believe, as cops, that you're hiding something. Wanting to shut the door, not letting us into the house, we can't do this, we can't do that.

PLAINTIFF:       You got no reason to come into the house.

OFFICER:         Why's that?

HARDIGREE:       He [Antman] was wanting to get a job. He was wanting to go to work. I work over there with my brother, Darryl Hardigree.

OFFICER:         You want me to tell you a secret? He sells so much dope,

                 he does not want to go to work.

PLAINTIFF:       Nope. No way.

OFFICER:         Yes.

HARDIGREE:       I'm going to go and get the phone.

LOFTON:          No, you ain't going nowhere. You're being detained at this time.

NORRIS:          Come out here and have a seat.

[Doc. No. 57-11, 34:00 to 37:44]. Plaintiff clearly attempted to terminate what was a consensual police encounter when he said: "It's my door. I can't close my door? You can't keep me from shutting my door" [Doc. No. 57-11, (36:11)]. But he was told by the police that he could not do so. He repeated his question, and he was

16

again told by the police that he could not shut the door. At this point, Plaintiff was unquestionably detained. Officer Lofton contends that this was a <u>Terry</u> stop.

In <u>Terry v. Ohio</u>, 392 U.S. 1, 30 (1968), the Supreme Court held that an officer does not violate the Fourth Amendment by conducting a "brief, investigatory stop when the officer has a reasonable, articulable suspicion that criminal activity is afoot." A <u>Terry</u> stop is a type of seizure under the Fourth Amendment because it restrains the freedom of the detainee to walk away or otherwise remove himself from the situation. <u>Terry</u>, 392 U.S. at 16. The standard of "reasonable suspicion" that is required to justify a <u>Terry</u> stop is significantly more lenient than that of "probable cause," which is necessary to support a warrant. <u>Illinois v. Wardlow</u>, 528 U.S. 119, 123 (2000).

"But when it comes to the Fourth Amendment, the home is first among equals." <u>Florida v. Jardines</u>, 569 U.S. 1, 6 (2013). At the Amendment's "very core" stands "the right of a man to retreat into his own home and there be free from unreasonable governmental intrusion." <u>Silverman v. United States</u>, 365 U.S. 505, 511 (1961). Thus, there is a heightened showing required before law enforcement can conduct a <u>Terry</u> stop of a suspect in his or her home.

In <u>Moore v. Pederson</u>, 806 F.3d 1036, 1044 (11th Cir. 2015), the Eleventh Circuit held that law enforcement may not conduct a <u>Terry</u> stop inside a residence

absent exigent circumstances.  Therefore, two critical issues in this case are: (1) whether reasonable, articulable suspicion existed, and (2) whether exigent circumstances existed at the time of Plaintiff's <u>Terry</u> stop.

### a.    Reasonable, Articulable Suspicion

Officer Lofton lists twelve "facts" in support of his reasonable, articulable suspicion:

(1)    Antman was a known drug dealer under surveillance by the Barrow County Sheriff's Department;

(2)    Antman left the Wall Road residence and drove a short distance to Plaintiff's residence;

(3)    Antman visited Plaintiff for a few minutes;

(4)    Antman was seen leaving quickly from Plaintiff's residence with a bag that contained methamphetamine;

(5)    Antman lied about his reason for being at Plaintiff's home;

(6)    Plaintiff's explanation for why Antman was at the residence was not credible because: Antman was a known drug dealer, Deputy Norris knew Antman sold a large amount of drugs (which made it unlikely that he would want to work), and Plaintiff was not a business owner or operating a business;

(7)    there was no other personal connection between Antman and Plaintiff;

(8)    Officer Lofton believed Plaintiff had some connection with drugs based on Plaintiff's DUI (less safe) arrest that occurred near a known drug house on Price Street;

(9)    Plaintiff's residence was in an area known for drug trafficking or drug sales;

(10)    Plaintiff was nervous, annoyed, and uncooperative;

(11)    Plaintiff did not show an expected level of interest in the police activity outside of his home; and

(12)    Plaintiff was not willing to give consent to search the property.

[Doc. No. 57-1, pp. 10-11]. The Court notes that Plaintiff takes issue with some of these facts and argues that Officer Lofton is incorrect. For example, Plaintiff argues that Antman's bag may not have contained methamphetamine because during the vehicle search, the drugs were found outside of the bag. But for purposes of this analysis, the Court will assume that these facts are true.

The Court will address generally the facts in support of Officer Lofton's reasonable, articulable suspicion that criminal activity was afoot. The first few facts (one through four) relate to the presence of Antman in Plaintiff's residence. Officer Lofton articulates: (1) Antman was a known drug dealer; (2) Antman left a drug house and went to Plaintiff's residence, which was a short distance away; (3) Antman was inside for a few minutes; and (4) Antman left quickly. Indeed, Officer Lofton first believed that Antman was burglarizing the home [Doc. No. 63-7, p. 15; Doc. No. 57-11, 24:10-15]. The law is clear that even prolonged and frequent association with a drug dealer, without more, is insufficient to establish probable cause to believe that a person is engaged in criminal activity. See generally Ybarra v. Illinois, 444 U.S. 85 (1979) (even though there was probable cause for a search warrant for contraband in a bar, there was no probable cause to search each customer because "mere propinquity" to suspect premises or persons could not suffice alone). There was no reasonable basis upon which law enforcement could conclude that

Plaintiff was engaged in criminal activity or that drugs were located in the residence based on Antman's presence for a short time in the residence.

The next couple of facts (five and six) relate to Antman and Plaintiff's explanations for why Antman was at Plaintiff's residence. The Court notes initially that Antman and Plaintiff had no obligation to tell the truth in responding to the officers' questions. Also, Antman and Plaintiff may have conveyed their subjective beliefs about the interaction and not necessarily lied. These facts would be more compelling if the two had lied about Antman being in the residence at all–a more objective fact that could have been testified to by Deputy Geiman.

As to the next fact (seven), any individual who is a stranger to both Antman and Plaintiff has no factual basis to conclude that they were strangers to one another.

As to the next fact (eight), the Court notes that apparently this arrest did not lead to a criminal conviction, although the timeline of the arrest and dismissal of the DUI charge is unclear from the record. While this fact could certainly be reasonably considered by Officer Lofton, his arrest history alone is insufficient to establish reasonable, articulable suspicion. Additionally, a DUI (less safe) arrest does not support a reasonable, articulable suspicion that Plaintiff is a drug purchaser, especially when Plaintiff contends that Officer Lofton knew that the drugs Plaintiff

was taking at the time of his DUI arrest (prescription medications) are different from those that Antman was selling.

As to the next fact (ninth), the fact that Plaintiff's residence may be located in an area known for drug trafficking or drug sales is not helpful for Officer Lofton. This may be compelling for reasonable, articulable suspicion for an individual who is exhibiting characteristics of drug dealing in an area particularly known for such. Here, in contrast, Plaintiff was inside his residence, and any such observations about the surrounding neighborhood are inappropriately made.

Finally, as to the remaining facts (ten through twelve), these are focused on Plaintiff's demeanor and failure to consent to a search of the home. As to his "nervous, annoyed, and uncooperative" demeanor, the audio recording does not necessarily support Officer Lofton's characterization of Plaintiff's behavior. In fact, until Plaintiff turned to retreat further into the residence (after the Terry stop had already occurred), Plaintiff appeared cooperative with law enforcement, short of consenting to a search of his residence. Given that many people would be nervous, annoyed, or uncooperative during such a police encounter, Officer Lofton would need to better articulate how Plaintiff was exceptionally nervous, annoyed, or uncooperative and why that mattered under these circumstances.

Finally, as to his failure to consent to a search of the residence, it is clearly established law that an individual's failure to consent to a search cannot be used to establish the reasonable, articulable suspicion for a Terry stop or the probable cause for a search warrant. See United States v. Boyce, 351 F.3d 1102, 1110 (11th Cir. 2003) ("police cannot base their decision to prolong a traffic stop on the detainee's refusal to consent to a search"); United States v. Massenburg, 654 F.3d 480, 491 (4th Cir. 2011) (if suspect's nervous behavior and repeated refusal to consent to a voluntary pat-down "sufficed to create reasonable suspicion, then Terry's reasonable suspicion requirement would become meaningless); Graves v. City of Coeur D'Alene, 339 F.3d 828, 842 (9th Cir. 2002) (defendant's refusal to consent to search "cannot correctly be a part of our probable cause determination"). Officer Lofton's argument otherwise reveals a fundamental misunderstanding of the Fourth Amendment.

Taken all together and construing the facts favorably to Officer Lofton, it is a very close question as to whether a reasonable officer would believe that he had reasonable, articulable suspicion to detain Plaintiff. The Court finds that genuine issues of material fact remain as to this issue. Even assuming Officer Lofton had reasonable, articulable suspicion as required by Terry, at the time that he detained

Plaintiff, there were no exigent circumstances that would have allowed a <u>Terry</u> stop in Plaintiff's residence.

### b.  Exigent Circumstances

The Fourth Amendment protects "the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const., amend. IV.  "The Fourth Amendment prohibits government searches and seizures involving private residences absent a warrant supported by probable cause." <u>United States v. Seidel</u>, 794 F. Supp. 1098, 1101 (S.D. Fla. 1992).  "It is a 'basic principle of Fourth Amendment law' that searches and seizures inside a home without a warrant are presumptively unreasonable." <u>Payton v. New York</u>, 445 U.S. 573, 586 (1980).  This presumption may be overcome in some circumstances because the ultimate touchstone of the Fourth Amendment is 'reasonableness.'" <u>Brigham City v. Stuart</u>, 547 U.S. 398, 403 (2006).  Accordingly, the warrant requirement is subject to certain reasonable exceptions.  <u>Id.</u>

One well-recognized exception applies when certain exigencies of the situation "make the needs of law enforcement so compelling that [a] warrantless search is objectively reasonable under the Fourth Amendment." <u>Mincey v. Arizona</u>, 437 U.S. 385, 394 (1978).  "[T]he Fourth Amendment has drawn a firm line at the entrance to the house.  Absent exigent circumstances, that threshold may not

reasonably be crossed without a warrant." Payton v. New York, 445 U.S. 573, 590 (1980).

Examples of exigent circumstances include, but are not limited to, hot pursuit of a suspected felon, the possibility that evidence may be removed or destroyed, and danger to the lives of officers or others. United States v. Mikell, 102 F.3d 470, 476 (11th Cir. 1996) (evidence); United States v. Santana, 427 U.S. 38 (1976) (hot pursuit); United States v. Hill, 430 F.3d 939 (8th Cir. 2005) (officer safety). In these limited situations, the need for effective law enforcement trumps the right of privacy and an individual's Fourth Amendment concerns. However, exigent circumstances do not meet Fourth Amendment standards if the government deliberately creates them. Kentucky v. King, 563 U.S. 452, 469 (2011).

The Court has found that Plaintiff was detained, at a minimum, at the time when he was told by Officer Lofton and Deputy Norris that he could not shut his door [Doc. No. 57-1, 36:11]. At this time, Officer Lofton and Deputy Norris admittedly had no officer safety concerns. Instead, the only exigency could be the need to prevent destruction of evidence. To determine whether a police officer faced an emergency that justified acting without a warrant, the Court must look to the totality of the circumstances and consider whether a reasonable officer would

believe that evidence of a crime is in danger of imminent destruction. <u>Missouri v. McNeely</u>, 569 U.S. 141, 149 (2013); <u>Cupp v. Murphy</u>, 412 U.S. 291, 294-95 (1973).

The Court has considered the totality of the circumstances and finds these facts particularly compelling:

(1) Law enforcement was outside Plaintiff's residence for over twenty minutes before they approached the door. Law enforcement knew for much of that time that Antman had left Plaintiff's residence with a bag that may have contained a substantial amount of methamphetamine. Rather than urgently acting and immediately approaching Plaintiff's residence, a video recording portrays that they stood near Antman's vehicle, laughing and chatting about his arrest.

(2) Officer Lofton's first thought was that Antman had probably burglarized the residence [Doc. No. 63-7, p. 15; Doc. No. 57-11, 24:10-15].

(3) When Trooper Smith finally did walk to the door, he spoke with another occupant of the residence, Torry Craig, whom he allowed to leave the doorway to walk into the home and get Plaintiff. Ms. Craig could have easily destroyed evidence at that time.

Under these circumstances, law enforcement demonstrated by their own actions that there was no "urgent need for immediate action" that would constitute an exigent circumstance. <u>McClish v. Nugent</u>, 483 F.3d 1231, 1240 (11th Cir. 2007). Also, significantly, as discussed above, law enforcement would had to have had a reasonable belief that drugs were contained within the residence and that the drugs were going to destroyed by Plaintiff. No such reasonable belief existed here. No exigency existed, and no reasonable officer could believe that it did.

As a result, the Court finds that under <u>Moore</u>, Officer Lofton violated Plaintiff's clearly established constitutional rights by detaining him (even before law enforcement's entry into the home) in violation of the Fourth Amendment. This detention was particularly egregious because Plaintiff attempted to terminate the police encounter but was told that he could not do so. This behavior strikes at the heart of rights protected by the Fourth Amendment.

## 2.    Entry into Residence (Count One)

After Deputy Norris ordered Plaintiff out of the residence, Plaintiff did not comply with the order. At that time, Officer Lofton contends that he was allowed to enter the home without a warrant due to exigent circumstances, specifically the imminent destruction of drugs that were brought to the residence by Antman. Specifically, Officer Lofton argues that he was entitled to secure the residence to prevent the destruction or removal of evidence pending the issuance of a search warrant.

Officer Lofton also appears to argue that he was attempting to secure the home when he ordered Plaintiff to step outside. In <u>Illinois v. McArthur</u>, 531 U.S. 326, 331 (2001), the Supreme Court held that there was no constitutional violation when an officer secured the premises by detaining an occupant outside of his home or by imposing restrictions, such as requiring the occupant to be accompanied by a police

officer while inside the home, so that another officer could obtain a search warrant. In determining if such a seizure is reasonable, courts should balance the occupant's privacy with law enforcement concerns.  Id.  The factors to weigh are: (1) probable cause to believe the home contained evidence of a crime and contraband; (2) a good reason to fear, unless restrained, the contraband would be destroyed; (3) the restriction must be reasonable to balance the law enforcement needs with the demands of personal privacy; and (4) the restriction must be limited in time.  Id.

   As discussed above, law enforcement had no reasonable belief that drugs were contained within the residence and had no reasonable belief that evidence was in danger of imminent destruction.  Since they certainly had no reasonable belief, they clearly had no probable cause.  No exigency based on drug evidence destruction existed, and no reasonable officer could believe that it did.

   Officer Lofton also appears to assert that he was concerned for his safety and the safety for other law enforcement officers on the scene.  Officer safety concerns may certainly create exigent circumstances that justify entry without a warrant.  But the officer's concern must be reasonable, and Officer Lofton's concern was not reasonable here.  As is evident from the audio recording of the incident, Plaintiff appeared to be cooperative during his interaction with the police.  When he moved away from the door (whether he ran away as Officer Lofton states or simply walked),

he had done nothing that would indicate he was a safety risk to the officers. To the contrary, he indicated that he was entering the residence to call his sister, which Defendants had asked him to do earlier. Significantly, there was no evidence that Plaintiff's residence contained a firearm. Plaintiff made no threatening remarks to law enforcement. Instead, Plaintiff merely attempted to retreat into his residence and terminate the police encounter. There was no officer safety exigency here.

The Court also notes that the nature of the risk is an important part of the calculus in determining whether a law enforcement officer may enter without a warrant. See United States v. Shannon, 21 F.3d 77, 81-82 (5th Cir. 1994) (entry of motel room to seize gun arrestee said was under mattress was proper, as "it would be reasonable for the officers to believe that there was a possibility of danger to themselves or other motel guests if an unknown suspect who might still be inside the room were to gain access to the gun"); Elkins v. McKenzie, 865 So.2d 1065, 1087 (Miss. 2003) (where "Eddie had a loaded gun pointed at officers and refused to lower the gun when repeatedly asked by the officers" and then backed into the house, causing officers to believe the danger was increasing because Eddie could fire from any of the many windows, exigent circumstances existed); United States v. Clarke, 564 F.3d 949, 959 (8th Cir. 2009) (where there was probable cause to believe meth production was ongoing, warrantless entry justified because "there was potential

threat to the safety of the officers, anybody inside the house, and anyone in the surrounding area"); State v. Smith, 199 P.3d 386, 389-90 (Wash. 2009) (where police found stolen tanker "pressure filled with 1,000 gallons of an extremely dangerous chemical" parked by house and then saw a rifle within house, but after two occupants exited the rifle was no longer visible, entry justified because person with missing gun might shoot at the officers or the tanker, "causing a grave health risk for all those in the vicinity"); Edwards v. United States, 619 A.2d 33, 36 (D.C. App. 1993) (where defendant had assaulted another with rifle and then seen by police to enter apartment building with rifle, but was later stopped therein without a weapon, police could make immediate warrantless entry into apartment, as "police knew that there was an unattended rifle, which had been used in a recent crime, that could be found by someone else in the building, including a child, and used again to the detriment of the officers or the community"). Here, in contrast, there was nothing to indicate that there was a substantial risk of harm to the officer or the public at large.

The Court also notes that even if such an officer safety exigency existed, Officer Lofton clearly created the exigency through his own conduct. Such police-created exigencies are not true exigencies. In considering whether Officer Lofton created the exigency, the Court must consider if his conduct prior to the entry was

entirely lawful, meaning that he "did not violate the Fourth Amendment or threaten to do so" prior to the exigency. <u>Kentucky v. King</u>, 563 U.S. 452, 462 (2011). As discussed above, Officer Lofton illegally detained Plaintiff even after Plaintiff attempted twice to terminate the police encounter by closing his door. Officer Lofton also attempted to illegally detain Plaintiff by ordering him to step outside of his residence. Under these circumstances, the Court is confident in finding that Officer Lofton did in fact violate the Fourth Amendment, and thereby created the officer safety exigency that he claims justified his entry into the residence.

The Court finds that Officer Lofton violated Plaintiff's clearly established constitutional rights by illegally entering his residence, so Officer Lofton is not entitled to qualified immunity. For that reason, Plaintiff's Motion for Partial Summary Judgment [Doc. No. 63] is GRANTED as to Officer Lofton, and Officer Lofton's Motion for Summary Judgment [Doc. No. 57] is DENIED as to Count One.

### 3.    Fruit of the Poisonous Tree

Before turning to the merits of Plaintiff's remaining claims, the Court will address Plaintiff's argument that the "fruit of the poisonous tree" doctrine applies in this case. If the doctrine does apply, according to Plaintiff, because Officer Lofton's entry into the residence was illegal, all later acts were also illegal.

The fruit of the poisonous tree doctrine is an evidentiary rule that operates in the context of criminal procedure. See Wong Sun v. United States, 371 U.S. 471, 484-88 (1963); Costello v. United States, 365 U.S. 265, 280 (1961) ("the 'fruit of the poisonous tree' doctrine excludes evidence obtained from or as a consequence of lawless official acts."). The doctrine is an extension of the long-recognized exclusionary rule and as such has generally been held "to apply only in criminal trials." See Segura v. United States, 468 U.S. 796, 804 (1984); Pennsylvania Bd. of Probation & Parole v. Scott, 524 U.S. 357 (1998). The Court finds no case, and Plaintiff has cited no case, in which the doctrine has been successfully invoked to support a § 1983 claim.

> The fruit of the poisonous tree doctrine is calculated to deter future unlawful police conduct and protect liberty by creating an incentive— avoidance of the suppression of illegally seized evidence—for state actors to respect the constitutional rights of suspects. Like the exclusionary rule, the fruit of the poisonous tree doctrine is a judicially created remedy designed to safeguard Fourth Amendment rights generally through its deterrent effect, rather than a personal constitutional right of the party aggrieved.

> As with any remedial device, the application of the [exclusionary] rule has been restricted to those areas where its remedial objectives are thought most efficaciously served. If . . . the exclusionary rule does not result in appreciable deterrence, then, clearly, its use . . . is unwarranted. The Supreme Court has refused for that reason to extend the exclusionary rule to non-criminal contexts, including civil tax proceedings, habeas proceedings, grand jury proceedings, INS deportation proceedings, and parole revocation proceedings. . . .

> Civil actions brought under § 1983 are analogous to state common law tort actions, serving primarily the tort objective of compensation. A § 1983 action, like its state tort analogs, employs the principle of proximate causation.
>
> The fruit of the poisonous tree doctrine, however, disregards traditional causation analysis to serve different objectives. To extend the doctrine to § 1983 actions would impermissibly recast the relevant proximate cause inquiry to one of taint and attenuation.

Townes v. City of New York, 176 F.3d 138, 145-46 (2d Cir. 1999) (quotations and citations omitted).

For these reasons, the Court finds that the fruit of the poisonous tree doctrine cannot be used to establish liability for Plaintiff's other claims against Officer Lofton. Instead, Plaintiff must still establish Officer Lofton's liability for his subsequent acts. The Court acknowledges that the fact that Officer Lofton was illegally present within the residence and the fact that Officer Lofton was giving Plaintiff illegal commands are relevant and important to the context of later decisions made by both Plaintiff and Defendants in this case, but the Court will address these claims independently.

This is consistent with authority from other Circuits. See, e.g., Townes, 176 F.3d at 145-46 (2d Cir. 1999) ("The fruit of the poisonous tree doctrine is not available to elongate the chain of causation" in a § 1983 lawsuit). Even if the entry was unlawful, under basic principles of tort law, law enforcement officers "would

be liable for the harm 'proximately' or 'legally' caused by their tortious conduct." Bodine v. Warwick, 72 F.3d 393, 400 (3d Cir. 1995). They would not, however, "necessarily be liable for all of the harm caused in the 'philosophic' or but-for sense by the illegal entry." Id.

This is also consistent with the Eleventh Circuit opinion in Black v. Wigington, 811 F.3d 1259, 1268 (11th Cir. 2016), in which the Court held that the exclusionary rule does not apply in a civil suit against police officers. In Black, the Court was concerned with suppression of evidence of a crime would result in "an overly truncated version of the evidence." Id. Thus, the Court held that police officers could "rely on illegally obtained evidence to defend themselves against other types of claims," including a § 1983 action. Id. Clearly, the Court of Appeals emphasizes the distinction between application of the doctrine in the criminal and civil contexts.

### 4. Arrest (Count Two)

The Court will now address Plaintiff's false arrest claim. Officer Lofton sets forth three offenses for which he claims there was probable cause to arrest Plaintiff: (1) disorderly conduct, in violation of O.C.G.A. § 16-11-39; (2) obstruction, in violation of O.C.G.A. § 16-10-24; and (3) simple battery, in violation of O.C.G.A. § 16-5-23

"There is no question that an arrest without probable cause to believe a crime has been committed violates the Fourth Amendment." Madiwale v. Savaiko, 117 F.3d 1321, 1324 (11th Cir. 1997). Qualified immunity, however, will protect Officer Lofton as to Plaintiff's false arrest claim if arguable probable cause existed for him to arrest Plaintiff. Storck v. City of Coral Springs, 354 F.3d 1307, 1315 (11th Cir. 2003). "'Arguable probable cause exists when an officer reasonably could have believed that probable cause existed, in light of the information the officer possessed.'" Id. (quoting Durruthy v. Pastor, 351 F.3d 1080, 1092 (11th Cir. 1997) (internal quotation marks omitted)). "'Even law enforcement officials who reasonably but mistakenly conclude that probable cause is present are entitled to immunity.'" Wood v. Kesler, 323 F.3d 872, 878 (11th Cir. 2003) (quoting Hunter v. Bryant, 502 U.S. 224, 227 (1991)). Moreover, qualified immunity applies so long as an officer "'has arguable probable cause to arrest for any offense.'" Merenda v. Tabor, 506 Fed. App'x 862, 865 (11th Cir. 2003) (per curiam) (quoting Grider v. City of Auburn, Ala., 618 F.3d 1240, 1257 (11th Cir. 2010)). Thus, "'the validity of an arrest does not turn on the offense announced by the officer at the time of the arrest.'" Id. (quoting Bailey v. Bd. of Cnty. Comm'rs of Alachua Cnty., 956 F.2d 1112, 1119, n.4 (11th Cir. 1992)).

When determining whether probable cause exists to support an arrest, the Court considers whether the arresting officer's actions were "objectively reasonable based on the totality of the circumstances." Kingsland v. City of Miami, 382 F.3d 1220, 1226 (11th Cir. 2004). "This standard is met when the facts and circumstances within the officer's knowledge, of which he or she has reasonably trustworthy information, would cause a prudent person to believe, under the circumstances shown, that the person has committed, is committing, or is about to commit an offense." Id. (internal quotation marks and citation omitted). "Although probable cause requires more than suspicion, it does not require convincing proof, and need not reach the [same] standard of conclusiveness and probability as the facts necessary to support a conviction." Wood, 323 F.3d at 878 (internal quotation marks and citation omitted). The officer's subjective intent is immaterial, and the Court instead must consider the facts objectively. Williams v. City of Homestead, Fla., 206 Fed. App'x 886, 888 (11th Cir. 2006) (per curiam).

"Whether an arresting officer possesses arguable probable cause depends on the elements of the alleged offense and the facts of the case." Turner v. Jones, 415 Fed. App'x 196, 199 (11th Cir. 2011) (per curiam). The Court will address the elements of each offense and discuss arguable cause for each offense below.

### i.     Disorderly Conduct

O.C.G.A. § 16-11-39 states that "[a] person commits the offense of disorderly conduct when such person commits any of the following: (1) acts in a violent or tumultuous manner toward another person whereby such person is placed in reasonable fear of the safety of such person's life, limb, or health." Officer Lofton argues that "Plaintiff's spontaneous flight caused him to be concerned for his safety" after "Plaintiff did not convey his intentions to the officers" [Doc. No. 57-1, p. 15].

Construing the facts in the light most favorable to Plaintiff, Plaintiff did not "flee" from the doorway. Instead, Plaintiff states that he walked away after conveying his intentions. The audio recording supports Plaintiff's testimony that he stated that he was going to call his sister [Doc. No. 57-11, 37:39]. Under these circumstances, the Court finds that Officer Lofton did not have a reasonable fear for his safety and no arguable probable cause existed for Plaintiff's arrest for disorderly conduct. Officer Lofton's Motion for Summary Judgment [Doc. No. 57] is DENIED as to this claim.

### ii.     Obstruction

Pursuant to O.C.G.A. § 16-10-24, "a person who knowingly and willfully obstructs or hinders any law enforcement officer . . . in the lawful discharge of his or her duties shall be guilty of a misdemeanor." Officer Lofton contends that

Plaintiff obstructed his duties by "fleeing." As discussed above, Plaintiff states that he walked away after conveying his intentions. The audio recording supports Plaintiff's testimony that he stated that he was going to call his sister [Doc. No. 57-11, 37:39]. This was, in fact, what Officer Lofton asked him to do.

Additionally, as discussed above, Officer Lofton was not in "lawful discharge of his . . . duties." His command to step outside was unlawful. A reasonable officer would have known that he did not have the authority to detain Plaintiff in his residence in these circumstances, neither under Terry nor McArthur. No probable cause existed for Plaintiff's arrest for obstruction, and Officer Lofton's Motion for Summary Judgment [Doc. No. 57] is DENIED as to this claim.

### iii. Simple Battery

Finally, a simple battery is committed when one "intentionally makes physical contact of an insulting or provoking nature of the person of another." O.C.G.A. § 16-5-23. Officer Lofton contends that Plaintiff shoved him between the time when Officer Lofton entered the residence and when Plaintiff was tased/subdued. In response, Plaintiff argues that he did not touch anyone. A reasonable jury could accept Plaintiff's version of the facts, so at a minimum, a genuine issue of material fact exists as to whether such physical contact ever occurred.

The Court also notes that under Georgia law, Plaintiff was entitled to resist an unlawful arrest. See Mullis v. State, 27 S.E.2d 91, 98 (Ga. 1943) ("Where an arrest is not lawful, the person sought to be so arrested, contrary to his right if the arrest had been lawful, has the right to resist, and in doing so has a right to resist force with force proportionate to that being used in unlawfully detaining him."); Traylor v. State, 193 S.E.2d 876, 878 (Ga. Ct. App. 1972) ("The defendant had the right to leave, and to ignore or defy the arrest, if said arrest was illegal."); Collins v. State, 111 S.E. 733, 736 (Ga. 1922) (explaining that citizens are "authorized to use such force as was necessary to resist the illegal search and arrest, and a homicide committed in defending against the illegal arrest and search would be murder, manslaughter, or justifiable homicide, according to whether there was malice, unnecessary force, or only such force as was necessary in resisting the arrest"). Even if such a shove took place, Officer Lofton was attempting to arrest Plaintiff for disorderly conduct and for obstruction. As discussed above, such arrests would have been made without arguable probable cause and were unlawful. Under these circumstances, Plaintiff may have proportionally resisted arrest by shoving Officer Lofton.

The Court is troubled by the circumstances of Plaintiff's arrest for assault. Although the fruit of the poisonous tree doctrine does not apply in this context,

Officer Lofton would not have been in the position to be shoved but for his unlawful entry into Plaintiff's residence and for his arrest of Plaintiff for other unfounded charges. In this circumstance, it seems particularly unfair to arrest Plaintiff for conduct that would not have occurred but for the unlawful conduct of law enforcement.

Officer Lofton's Motion for Summary Judgment [Doc. No. 57] is DENIED as to this claim.

### 5.    Force (Count Four)

Plaintiff also claims that Officer Lofton violated his Fourth Amendment right to be free from the use of force by repeatedly tasing him. Officer Lofton contends that his use of force was justified because Plaintiff attempted to flee, Officer Lofton was not familiar with his surroundings, and Plaintiff did not comply with Officer Lofton's commands.

"The Fourth Amendment's freedom from unreasonable searches and seizures encompasses the plain right to be free from the use of excessive force in the course of an arrest." Lee v. Ferraro, 284 F.3d 1188, 1197 (11th Cir. 2002) (citing Graham v. Connor, 490 U.S. 386, 394-95 (1989)). The reasonableness inquiry is an objective one: "the question is whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their

underlying intent or motivation." Graham, 490 U.S. at 397 (citations omitted). In other words, "[a]n officer's evil intentions will not make a Fourth Amendment violation out of an objectively reasonable use of force; nor will an officer's good intentions make an objectively unreasonable use of force constitutional." Id. (citations omitted).

A court may consider a number of factors when determining whether the force applied was "reasonable" under the circumstances, including: (1) the "severity, or lack of severity, of the alleged crime in issue," id. at 396; (2) "whether the person against whom the force was used posed an immediate threat to the safety of the police or others," id.; (3) "the need for the application of force," Jackson v. Sauls, 206 F.3d 1156, 1170 n.18 (11th Cir. 2000); (4) "the relationship between the need and the amount of force used," id.; (5) "the extent of the injury inflicted," id.; (6) "whether the force was applied in good faith or maliciously and sadistically," id.; (7) "the possibility that the persons subject to the police action are themselves violent or dangerous," id.; (8) "the possibility that the suspect may be armed," id.; (9) "the number of persons with whom the police officers must contend at one time," id.; and (10) "whether the suspect was resisting or fleeing." Id.

The reasonableness of the force applied also is measured as of the precise moment it is administered; events that occurred before that moment, though perhaps

giving factual context to the use of force, are not probative of the reasonableness of the decision to use force. See Greenidge v. Ruffin, 927 F.2d 789, 792 (4th Cir. 1991). Additionally, "[u]se of the force must be judged on a case-by-case basis 'from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight.'" Post v. City of Fort Lauderdale, 7 F.3d 1552, 1559 (11th Cir. 1993) (quoting Graham, 490 U.S. at 396). "The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." Graham, 490 U.S. at 396-97.

The audio recording of the encounter from Officer Lofton's dash camera captured the following dialogue:

| NORRIS: | Come out here and have a seat. |
| LOFTON: | Yeah, come out here. If you don't come out here – uh, uh, uh, uh, uh, come here! |
| OFFICER: | 10-10. |

(First taser deployment at 37:50.[2])

---

[2] The Court notes that the taser deployment log is not attached as an exhibit, but it seems that at least two of its uses (first with the prongs and then later in drive stun mode) are audible in the recording. Defendants have not provided the taser deployment log to

PLAINTIFF:       God damnit.  Oh, God damnit.

LOFTON:          Get on the ground.

(Plaintiff screams.)

LOFTON:           Get on the fucking ground.

(Plaintiff screams.)

WIFE:            You're hurting him!

OFFICER:         Give me your hands!  Hands!  Hands!

NORRIS:          Drive stun him.  Drive stun him.

(Another tase at 38:04.)

PLAINTIFF:       Please don't do it again.

OFFICER:         Put your hands behind your back, or we'll do it again.

GEIMAN:          Don't fucking move.

WIFE:            He didn't even run away.

LOFTON:          Yes, he did.  Now shut up.  You didn't see shit.  Now shut up.

OFFICER:         You stay your ass right there, you got it?  Are we clear? You sure?  Thank you.

PLAINTIFF:       Aw damn.  That hurt.  They got me three or four times.

---

Plaintiff in discovery, although Plaintiff appears to have requested it.  This production should be made as soon as possible, but within fourteen days.

OFFICER:        Yeah, you weren't listening.

[Doc. No. 57-11, 37:40 to 39:40].

As an initial matter, the Court notes that if Plaintiff's arrest was unlawful, the force used by Officer Lofton was inherently excessive. See Bashir v. Rockdale City, 445 F.3d 1323, 1332 (11th Cir. 2006). Because genuine issues of material fact remain as to the assault arrest, the Court cannot find as a matter of law that the force was inherently excessive.

Officer Lofton relies upon three hotly contested facts to justify his use of force against Plaintiff: (1) Plaintiff shoved him; (2) Plaintiff squared up to fight him; and (3) once on the ground, Plaintiff did not comply with law enforcement commands but instead fought with law enforcement. Plaintiff contests this version of events, and a reasonable jury could find that Plaintiff did nothing that would justify any use of a taser to ensure compliance with his potentially unlawful arrest. Officer Lofton's Motion for Summary Judgment [Doc. No. 57] is DENIED as to this claim.

### 6.    Malicious Prosecution (Count Three)

Plaintiff also asserts a malicious prosecution claim against Officer Lofton. Officer Lofton argues that Plaintiff cannot prove the essential elements of this claim because he was not "seized" pursuant to legal process and because the prosecution did not terminate in his favor.

Malicious prosecution is a violation of the Fourth Amendment and is a viable constitutional tort under § 1983. See Kingsland, 382 F.3d at 1234. To establish such a claim, a plaintiff must prove: (1) the elements of the common law tort of malicious prosecution, and (2) a violation of his Fourth Amendment right to be free from unreasonable seizures. Wood v. Kesler, 323 F.3d 872, 881 (11th Cir. 2003). It is a two-part showing, and to avoid summary judgment, a plaintiff "bears the burden of proving that she was seized in relation to the prosecution, in violation of [his or] her civil rights." Kingsland, 382 F.3d at 1235. To the constituent elements of the common law tort of malicious prosecution, the Court must look to both federal and state law and determine how those elements have historically developed. Id. To prove such a common law claim under federal law and Georgia law, a plaintiff must establish the following: "(1) a criminal prosecution instituted or continued by the present defendant; (2) with malice and without probable cause; (3) that terminated in the plaintiff accused's favor; and (4) caused damage to the plaintiff accused." Kjellsen v. Mills, 517 F.3d 1232, 1237 (11th Cir. 2008) (quoting Wood, 323 F.3d at 881-82).

The Court will first address whether Plaintiff was "seized" within the meaning of the Fourth Amendment. The parties' analysis of this requirement was superficial at best. Plaintiff argues that he was seized within the meaning of the Fourth

Amendment when Officer Lofton issued a series of accusations and summonses that initiated legal proceedings against him. According to Plaintiff, the "seizure" was his arrest which was conducted pursuant to these charges.

But to establish a Section 1983 claim for malicious prosecution,

the deprivation of liberty—the seizure—must have been effected "pursuant to legal process." . . . Ordinarily, this "legal process" will be either in the form of a warrant, in which case the arrest itself may constitute the seizure, or a subsequent arraignment, in which case any post-arraignment deprivations of liberty (such as being bound-over for trial) might satisfy this constitutional requirement.

Love v. Oliver, 450 F.Supp.2d 1336, 1340 (11 Cir. 2006) (quoting Singer v. Fulton County Sheriff, 63 F.3d 110, 116-17 (2d Cir. 1995)).

In the case of a warrantless arrest, the judicial proceeding does not begin until the party is arraigned or indicted. Thus, the plaintiff's arrest cannot serve as the predicate deprivation of liberty because it occurred prior to the time of arraignment and was not one that arose from malicious prosecution as opposed to false arrest.

Kingsland, 382 F.3d at 1235 (quotation and citation omitted); see also Mejia v. City of New York, 119 F.Supp.2d 232, 254 n. 26 (E.D.N.Y. 2000) (holding "plaintiff's arrest cannot serve as the predicate deprivation of liberty because it occurred prior to his arraignment and without a warrant, and therefore was not pursuant to legal process, *i.e.*, not one that arose from malicious prosecution as opposed to false arrest") (quotation and citation omitted); Nieves v. McSweeney, 241 F.3d 46, 54 (1st Cir. 2001) ("The tort of malicious prosecution permits damages for a deprivation of

liberty—a seizure—pursuant to legal process. Generally, the offending legal process comes either in the form of an arrest warrant (in which case the arrest would constitute the seizure) or a subsequent charging document (in which case the sum of post-arraignment deprivations would comprise the seizure).") (citations omitted). Additionally, the Eleventh Circuit has held that normal conditions of pre-trial release do not constitute a continuing seizure barring some "significant deprivation of liberty." Kingsland, 382 F.3d at 1236.

The record is unclear as to the exact circumstances of Plaintiff's arraignment and subsequent release on bond. However, Officer Lofton represents to the Court that Plaintiff was released on bond, and Plaintiff does not contest this representation. While Plaintiff may have suffered anxiety and inconvenience, as did the plaintiff in Kingsland, he has not shown that the conditions of his pretrial release (which are not in the record) constituted a significant deprivation of his liberty. As such, the Court finds that Plaintiff was not "seized" within the meaning of the Fourth Amendment, and his malicious prosecution claim fails as a matter of law. Officer Lofton's Motion for Summary Judgment [Doc. No. 57] is GRANTED as to Count Three.

### 7. State Law Claims (Count Five)

Plaintiff asserts four state law claims against Officer Lofton: (1) false imprisonment pursuant to O.C.G.A. § 51-7-20; (2) malicious prosecution pursuant

to O.C.G.A. § 51-7-40; (3) assault pursuant to O.C.G.A. § 51-1-13; and (4) battery pursuant to O.C.G.A. § 51-1-14.  Officer Lofton argues that he did not engage in tortious conduct and that he is entitled to official immunity from these claims.  The Court will address the basis for the state law claims and then address official immunity.

### i.    False Imprisonment

Plaintiff asserts a false imprisonment claim against Officer Lofton under Georgia law.  Under Georgia law, false imprisonment is defined as "the unlawful detention of the person of another, for any length of time, whereby such person is deprived of his personal liberty." O.C.G.A. § 51-7-20. "The essential elements of the claim are the arrest or the detention and the unlawfulness thereof."  Kline v. KDB, Inc., 673 S.E.2d 516, 518 (Ga. Ct. App. 2009). An arrest is "the taking, seizing, or the detaining of the person of another...by any act indicating an intention to take such person into custody" and "which subjects such person to the actual control and will of the person making the arrest."  Conoly v. Imperial Tobacco Co., 12 S.E.2d 398 (Ga. Ct. App. 1940).

In the context of warrantless arrests, an officer will be guilty of this tort unless he can justify the arrest under one of the exceptions enumerated in O.C.G.A. § 17-4-20.  Collins v. Sadlo, 306 S.E.2d 390, 391 (Ga. Ct. App. 1983) (emphasis omitted)

(citations and internal quotations omitted). Based on the exceptions in O.C.G.A. §
17-4-20, "it is readily apparent that all...exceptions to the warrant requirement...in
essence presuppose the existence of sufficient probable cause." Id. Thus,"to avoid
liability for false imprisonment it must be shown not only that arrest was valid but
also that the arresting officer had probable cause." Amason v. Kroger Co., 420
S.E.2d 314, 316 (Ga. Ct. App. 1992).

As discussed above, viewing the evidence in the light most favorable to
Plaintiff, there is a genuine issue of material fact as to whether Plaintiff was
unlawfully detained.

### ii.    Malicious Prosecution

Plaintiff asserts a malicious prosecution claim against Officer Lofton under
Georgia law. The elements of a malicious prosecution claim include: (1) prosecution
for a criminal offense; (2) the prosecution instigated under a valid warrant,
accusation, or summons; (3) termination of the prosecution in favor of the plaintiff;
(4) malice; (5) want of probable cause; and (6) damage to the plaintiff. O.C.G.A. §
51-7-40; Sizemore Security Int'l v. Lee, 287 S.E.2d 782, 783 (Ga. Ct. App. 1982).
As discussed above, genuine issues of material fact remain that preclude summary
judgment as to probable cause for the assault claim. There is also a genuine material
fact as to malice.

### iii.     Assault and Battery

A simple battery is committed when one "intentionally makes physical contact of an insulting or provoking nature of the person of another." O.C.G.A. § 16-5-23. A simple assault is committed when one "(1) [a]ttempts to commit a violent injury to the person of another; or (2) [c]ommits an act which places another in reasonable apprehension of immediately receiving a violent injury." O.C.G.A. § 16-5-20. As discussed above, genuine issues of material fact remain that preclude summary judgment. If Officer Lofton had no legal basis to use force to effectuate his arrest of Plaintiff, his conduct towards Plaintiff could constitute assault and battery under Georgia law.

### iv.     Official Immunity

Even if Officer Lofton did engage in tortious conduct, he may still be entitled to official immunity under Georgia law. The Georgia Constitution provides, in relevant part, that State officers and employees "may be liable for injuries and damages if they act with actual malice or with actual intent to cause injury in the performance of their official functions." Ga. Const., art. I, § II, ¶ IX(d). Thus, "[a] suit against a public officer acting in his or her official capacity will be barred by official immunity unless the public officer (1) negligently performed a ministerial duty, or (2) acted with actual malice or an actual intent to cause injury while

performing a discretionary duty." <u>Tant v. Purdue</u>, 629 S.E.2d 551, 553 (Ga. Ct. App. 2006) (quoting <u>Wanless v. Tatum</u>, 536 S.E.2d 308, 309 (Ga. Ct. App. 2000)).

"In the context of official immunity, 'actual malice' means a deliberate intent to do wrong." <u>Reed v. DeKalb Cnty.</u>, 589 S.E.2d 584, 587 (Ga. Ct. App. 2003) (<u>Merrow v. Hawkins</u>, 467 S.E.2d 336, 337 (Ga. 1996)). Proof of ill will, standing alone, is insufficient to establish actual malice. <u>Adams v. Hazelwood</u>, 520 S.E.2d 896, 898 (Ga. 1999). Instead, "in the context of official immunity, actual malice means a deliberate intention to do a wrongful act." <u>Id.</u> "Such act may be accomplished with or without ill will and whether or not injury was intended." <u>Id.</u>

The parties appear to agree that Officer Lofton was performing discretionary duties during his encounter with Plaintiff. Thus, the Court must consider whether he acted with actual malice or an intent to cause injury. Plaintiff has the burden to establish actual malice, and points to the following record evidence in support of his claims:

- Officer Lofton testified that he did not have probable cause to arrest Plaintiff at the time but entered the house regardless.
- Officer Lofton falsely accused Plaintiff of being a drug dealer without any reasonable basis.
- Officer Lofton arrested Plaintiff without an arguable basis for the second time within a year.
- Officer Lofton tasered Plaintiff in the penis with the prongs from a short distance. Officer Lofton also tasered Plaintiff in his upper thigh in drive stun

mode.  A reasonable jury could find that Officer Lofton targeted Plaintiff's groin area.

- Officer Lofton made up the fact that Plaintiff pushed or shoved him.
- Officer Lofton made up the fact that Plaintiff resisted arrest.
- Officer Lofton charged Plaintiff with disorderly conduct even though there was no basis for that charge.

Officer Lofton, in response, insists that Plaintiff's reasons are inadmissible, misleading, or altogether false.

The Court finds that genuine issues of material fact exist that preclude a grant of summary judgment in favor of Officer Lofton.  Some or all of Plaintiff's contentions, if true, could establish actual malice that would justify a denial of official immunity.  Accordingly, Officer Lofton's Motion for Summary Judgment [Doc. No. 57] is DENIED as to Count Five.

### C.    Defendant Deputy Chad Norris

Deputy Norris has moved for summary judgment and asserts qualified immunity [Doc. No. 60].  Plaintiff asserts claims against Deputy Norris for illegal entry, false arrest, and excessive force.  The Court will address the claims in turn.

### 1.    Entry (Count One)

Above, the Court found that Officer Lofton violated Plaintiff's clearly established constitutional rights by entering his residence.  However, that analysis is not as straightforward as to Deputy Norris.  Deputy Norris argues that two exigent

circumstances allowed his entry into Plaintiff's residence: (1) officer safety, and (2) the potential for destruction of evidence. As discussed above, there was no reasonable basis for Deputy Norris to conclude that drugs were in the residence and that said drugs were in imminent danger of destruction. But the Court is persuaded that the officer safety exigency applied.

Here, the parties agree that Deputy Norris entered the residence immediately after Officer Lofton. Although Deputy Norris should have been skeptical of the circumstances, Deputy Norris was unaware of what Officer Lofton may have seen or heard that spurred Officer Lofton's entry into the residence. Deputy Norris acted reasonably when entering the residence after Officer Lofton to ensure the safety of his fellow law enforcement officer, and this was not a Fourth Amendment violation. The Court notes that even if it were, it would certainly not be a violation of clearly established constitutional law, and Deputy Norris would be entitled to qualified immunity as to Count One. Deputy Norris's Motion for Summary Judgment [Doc. No. 60] is GRANTED as to Count One.

### 2.    Arrest (Count Two)

Deputy Norris does not address the arrest claim in his Motion for Summary Judgment.

### 3. Force (Count Four)

Deputy Norris argues that he is entitled to summary judgment on the excessive force claim because he never made physical contact with Plaintiff. In response, Plaintiff argues that Deputy Norris is subject to liability because he: (1) failed to intervene in Officer Lofton's excessive force, and (2) actively encouraged Officer Lofton to use excessive force.

The Eleventh Circuit has held that an officer who is present at the scene and fails to take reasonable steps to protect the victim of another officer's use of excessive force can be held liable for failure to act if the officer was "in a position to interview yet failed to do so." Skrtich v. Thornton, 280 F.3d 1295, 1302 (11th Cir. 2002); Priester v. City of Riviera Beach, Fla., 208 F.2d 919, 924 (11th Cir. 2000); O'Kelley v. Craig, No. 18-14512, 2019 WL 3202928, at *5 (N.D. Ga. July 16, 2019). This duty to intervene only applies if the force-using officer violated clearly established law or if the force was so utterly disproportionate that "any reasonable officer would have recognized that his actions were unlawful." Oliver v. Fiorino, 586 F.3d 898, 908 (11th Cir. 2009); Callwood v. Jones, 727 Fed. App'x 552, 560 (11th Cir. 2018).

As discussed above, there are genuine issues of material fact that preclude summary judgment related to the use of any force against Plaintiff, much less

reasonable force. Because the failure to intervene theory is a viable theory of recovery, Deputy Norris's Motion for Summary Judgment [Doc. No. 60] is DENIED as to Count Four. Also, the Court notes that Plaintiff may have an actionable claim against Deputy Norris for actively encouraging the use of excessive force, although Plaintiff has cited no cases in support of this proposition. The Court will consider the viability of this theory at trial.

### D.     Defendant Trooper Garrett Smith

As an initial matter, Plaintiff has consented to the dismissal of Count Four (the excessive force claim) as to Trooper Smith [Doc. No. 76, p. 31, n.18], and Plaintiff has made no argument about Trooper Smith regarding Count Two (the false arrest claim). Trooper Smith's Motion for Summary Judgment [Doc. No. 55] is GRANTED as to Counts Two and Four. The Court will now address Trooper Smith's arguments regarding Count One (the illegal entry claim).

Specifically, Trooper Smith argues that he is entitled to qualified immunity on Count One. The parties agree that Trooper Smith entered the residence after the force incident and after the arrest to perform a protective sweep. The parties also seem to agree that Trooper Smith was acting within the scope of his discretionary authority. Thus, the burden shifted to Plaintiff to prove that Trooper Smith violated a clearly established constitutional right. Plaintiff has not addressed this issue as to

Trooper Smith. As a result, the Court finds that Trooper Smith is entitled to qualified immunity on Count One, and his Motion for Summary Judgment [Doc. No. 55] is GRANTED as to Count One. Plaintiff's Motion for Partial Summary Judgment [Doc. No. 63] is DENIED as to Defendant Smith.

### E.    Defendant City of Statham

As an initial matter, Plaintiff has consented to the dismissal of all federal claims against the City of Statham [Doc. No. 76, p. 35]. Plaintiff has also consented to the dismissal of his state law claims against the City for false imprisonment and assault and battery [Doc. No. 76, p. 36]. Defendant City of Statham's Motion for Summary Judgment [Doc. No. 59] is GRANTED as to Counts One, Two, Four, and the state law claims for false imprisonment and assault and battery contained within Count Five. The Court will now address Plaintiff's remaining claims against the City, which are his negligent training/supervision claim and his malicious prosecution claim.

#### 1.    Negligent Training and Supervision

The City argues that it is entitled to summary judgment on Plaintiff's negligent training and supervision claim because Plaintiff failed to give timely and proper ante litem notice of his claim. O.C.G.A. § 36-33-5(a) prohibits any claims for money damages against municipal corporations "without first giving notice . . . [w]ithin six

months of the event upon which a claim against a municipal corporation is predicated

. . . in writing to the governing authority of the municipal corporation." The purpose

of the ante litem requirement is to give the municipality "the opportunity to

investigate potential claims, ascertain evidence, and avoid unnecessary litigation."

Davis v. City of Forsyth, 621 S.E.2d 495, 498 (Ga. Ct. App. 2005) (citation omitted).

Satisfaction of the ante litem notice requirement is a condition precedent to bringing

suit against a municipal corporation for damages resulting from injuries to person or

property. O.C.G.A. § 36-33-5(a); see, e.g., Harris-Jackson v. City of Cochran, 652

S.E.2d 607, 609 (Ga. Ct. App. 2007). Under Georgia law, failure to comply with

the statute is an absolute bar to a state law claim against a municipality. Fulton v.

City of Roswell, 982 F.Supp. 1472, 1475 (N.D. Ga. 1997).

Plaintiff's claim for negligent training and supervision fails as a matter of law

because there is no evidence that Plaintiff provided the city with proper notice of his

claim within six months of August 4, 2016, the date Plaintiff was arrested and

charged pursuant to the citations issued by Officer Lofton. In fact, Plaintiff only

sent one purported ante litem notice to the City, which was dated July 6, 2017, well

outside the six-month period. There is no evidence that Officer Lofton took any

action following the date of the incident on August 4, 2016, that would bear on the

City's training and supervision of him. Because the ante litem notice was untimely,

the City is entitled to summary judgment.  The Court also notes that Plaintiff's ante litem notice fails to substantially comply with the notice requirements of O.C.G.A. § 36-33-5(b) because it fails to explain how the City engaged in negligent training and/or supervision, so his claim also fails for that reason.  The City's Motion for Summary Judgment [Doc. No. 59] is GRANTED as to the negligent training and supervision claim.

### 2.     Malicious Prosecution

The City argues that it is entitled to sovereign immunity on Plaintiff's malicious prosecution claim.  The Georgia Constitution expressly provides that immunity for tort claims can be waived only by a legislative act specifically providing for such waiver and setting forth the extent thereof.  Ga. Const., Art. I, Sec. II, Par. IX(e); O.C.G.A. § 36-33-1 ("it is the public policy of the State of Georgia that . . . municipal corporations shall be immune from liability for damages").  O.C.G.A. § 36-33-3 provides that municipalities "shall not be liable for the torts of policemen or other officers engaged in the discharge of the duties imposed on them by law."  The parties agree that at the time Officer Lofton performed the challenged actions, he was discharging the duties imposed upon him as a law enforcement officer.  Thus, the City argues that the plain language of O.C.G.A. § 36-33-3 bars Plaintiff's claim.

In response, Plaintiff cites four cases in support of his contention that Georgia courts are unanimous in holding that, notwithstanding the language of O.C.G.A. § 36-33-3, a municipality's purchase of liability insurance acts as a waiver of sovereign immunity, such that the municipality can be held liable for the torts of its police officer agents under general tort principles of *respondeat superior* and/or vicarious liability. See Jordan v. City of Rome, 417 S.E.2d 730 (Ga. Ct. App. 1992); Ekarika v. City of East Point, 420 S.E.2d 391 (Ga. Ct. App. 1992); Williams v. Solomon, 531 S.E.2d 734 (Ga. Ct. App. 2000); McLemore v. City Council of Augusta, 443 S.E.2d 505 (Ga. Ct. App. 1994). However, each of these cases arises out of an employee's negligent use of a motor vehicle and addresses a city's waiver of sovereign immunity under O.C.G.A. § 33-24-51(b). The City's alleged liability in this case is not premised on Officer Lofton's negligent use of a motor vehicle and instead exclusively arises out of torts while he was engaged in the discharge of law enforcement duties. For that reason, O.C.G.A. § 33-24-51(b) does not apply.

The Court finds that sovereign immunity bars Plaintiff's claim for malicious prosecution against the City. Defendant City of Statham's Motion for Summary Judgment [Doc. No. 59] is GRANTED as to the malicious prosecution claim.

## IV. Conclusion

For the reasons discussed above,

(1)     Plaintiff's Motion for Partial Summary Judgment [Doc. No. 63] is GRANTED in part and DENIED in part.  The Motion is GRANTED as to Count One (illegal entry) as to Officer Lofton but is otherwise DENIED.

(2)     Defendant Officer Lofton's Motion for Summary Judgment [Doc. No. 57] is GRANTED in part and DENIED in part.  The Motion is DENIED as to Count One (illegal entry), DENIED as to Count Two (false arrest), GRANTED as to Count Three (malicious prosecution), DENIED as to Count Four (excessive force), and DENIED as to Count Five (state law claims).

(3)     Defendant Deputy Norris's Motion for Summary Judgment [Doc. No. 60] is GRANTED in part and DENIED in part.   The Motion is GRANTED as to Count One (illegal entry) and DENIED as to Count Four (excessive force).

(4)     Defendant Trooper Smith's Motion for Summary Judgment [Doc. No. 55] is GRANTED.

(5)     Defendant City of Statham's Motion for Summary Judgment [Doc. No. 59] is GRANTED.

Plaintiff, Defendant Officer Lofton, and Defendant Deputy Norris are ORDERED to file a proposed consolidated pretrial order within thirty days of this order.

**SO ORDERED** this 30th day of July, 2019.

_____
**RICHARD W. STORY**
United States District Judge